\UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| LADONNA BLEWETT,<br><br>    Plaintiff,<br><br>v.<br><br>NIKOLE HOWARD-WHISETT and<br>CITY OF DETROIT,<br><br>    Defendants. | Case No. 23-12524<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [15]**

LaDonna Blewett, a former accountant for the Detroit Water and Sewerage Department, claims that she was subjected to a racially hostile work environment by and ultimately fired because of her race in violation of state and federal civil rights laws. She says her supervisor, Nikole Howard-Whisett, would constantly criticize her work and berate her in front of her coworkers, but would give her white coworker, Dawn Green, special privileges. Following discovery, Defendants Howard-Whisett and the City of Detroit moved for summary judgment, arguing that Blewett failed to make out a prima facie case of race discrimination or a racially hostile environment. They say that Blewett was fired not because of her race but because of her poor work performance. The undisputed record supports their argument. Thus, the motion is GRANTED.

I.

In October 2016, LaDonna Blewett began working as a staff accountant for the Treasury Division of the Detroit Water and Sewerage Department. (ECF No. 15-2, PageID.137, 139.) Her main responsibility was to process wire transfers that came into and went out of the department and log these transfers in a daily cashbook. (*Id.* at PageID.137–138, 140, 218–219.) She was required to submit the cashbook to her manager, Nikole Howard-Whisett, between 11 a.m. and 12 p.m. each day. (*Id.* at PageID.140–142.) In addition, she was required to submit journal entries at the beginning of each month that detailed the previous month's transfers and credit card payments and noted any imbalances that needed to be resolved. (*Id.* at PageID.139–140.)

Blewett performed much of her work well, but reportedly had difficulties completing her assignments on time—especially her daily cashbook. In Blewett's 2018 performance review, Howard-Whisett noted that Blewett's strengths included "providing an excellent paper trail and compiling back up for her work," maintaining a "positive attitude," and "provid[ing] good customer service." (ECF No. 19-1, PageID.348.) She said Blewett did "a tremendously accurate and timely job with processing, communicating and filing the wires." (*Id.*) On the other hand, she also noted that Blewett's cashbook "was not accurate nor completed on a timely basis" and "[t]here were instances where changes took weeks or months to correct and complete." (*Id.* at PageID.347–348.) Blewett signed the performance review and indicated that she agreed with the issues that were raised, admitting "[t]he cashbook was a

challenge for me, which lead [sic] to non-accuracy and incomplete information," but promising to improve. (*Id.* at PageID.349.)

In the following years, however, things did not improve. Blewett's 2019 performance review, again authored by Howard-Whisett, indicated she still struggled to meet deadlines without reminders, often made mistakes, and needed to "pay attention to detail and proofread." (ECF No. 18-2, PageID.321–322.) Blewett's 2020 performance review from Howard-Whisett was worse. (*Id.* at PageID.324 ("[P]rioritizing, completing assignments and meeting deadlines seem[s] to be a big problem. . . . Deadlines are constantly being missed even when I let her set her own. LaDonna also makes numerous errors on assignments that she has done numerous times. . . . There have been assignments that LaDonna did not complete at all even after acknowledging that she knew it was to be completed.").) In particular, Blewett's "dependability and reliability" rating showed a steady decline: from "achieved expectations" in 2018 (ECF No. 19-1, PageID.347), to "minimally satisfactory" in 2019 (ECF No. 18-2, PageID.330), and finally to "unacceptable" in 2020 (*Id.* at PageID.324). And her 2020 review noted "[s]he was late completing the cashbook 101 days out of 214 which is 47% of the time" and "[s]he was late" reconciling the cashbook "10 months out of 12 which is 83% of the time." (*Id.* at PageID.326.)

Two months after her 2020 review, Blewett was terminated. (ECF No. 1, PageID.8.) The termination notice cited her "poor work performance" and these same statistics about her tardy cashbook. (ECF No. 15-3, PageID.238.) It also noted that her journal entries often had to be redone two or three times due to errors. (*Id.*)

3

Blewett acknowledged that her work was "not a hundred percent perfect" but disputed that there were significant errors. (ECF No. 15-2, PageID.173–179.) She admitted that she "probably was" late turning in the cashbook "due to something" but was "not aware" that she was late 101 times, as Defendants assert. (*Id.* at PageID.191; *see* ECF No. 15, PageID.113.) She also disagreed that the cashbook was ever late by 101 days, though later testified "if it was [101 days late], why wasn't it brought to my attention the 30th day." (ECF No. 15-2, PageID.189.) For their part, Defendants clarify that Blewett was not "101 days late" but rather "was late ***101 times***." (ECF No. 15, PageID.113.) Blewett questions, however, if her performance was indeed poor, why she received no prior or progressive discipline before being fired. (ECF No. 18, PageID.293, 299.)

Blewett's answer is discrimination. She contends that she "performed her role similarly to her coworkers" but was treated differently because of her race. (ECF No. 18, PageID.292, 301.) She also asserts that she was subjected to a hostile work environment. (*Id.* at PageID.300.) The crux of these allegations is Blewett's belief that her one white coworker, Dawn Green, received more favorable treatment from Howard-Whisett, who is African American, than Blewett and her African American colleagues. (*Id.* at PageID.301.) Blewett contends that Green had similar performance issues and yet was not terminated—instead, she says, Green received "special privileges" and "preferential treatment in both expectations as well as criticism because she was a white employee." (ECF No. 18, PageID.301.)

4

Defendants disagree and argue that Blewett has "not produced any evidence establishing a prima facie case under any of her claims." (ECF No. 15, PageID.108.) This, they say, entitles them to summary judgment. Oral argument would not aid in the resolution of their motion. *See* E.D. Mich. LR 7.1(f).

## II.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

One way that the moving party may discharge its initial summary judgment burden is by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (citing Fed. R. Civ. P. 56(c), (e)). If the moving party does so, the party opposing the motion must do more than rely upon allegations, and "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, "[w]hile all inferences are drawn in favor of the non-moving party, that party still must present some affirmative evidence supporting its position to defeat an otherwise appropriate motion for summary judgment." *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2007). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere

5

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Importantly, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989).

## III.

Blewett brings three claims: a claim of a hostile work environment in violation of the ELCRA (ECF No. 1, PageID.12–14), a claim of race-based discrimination in violation of the ELCRA (*id.* at PageID.11–12), and an equal protection claim under § 1983 (*id.* at PageID.10).

## A.

Start with Blewett's hostile work environment claim. Because the analysis of hostile work environment claims under the ELCRA is identical to the Title VII analysis, the Court cites Title VII and ELCRA case law interchangeably. *See Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012); *Rouch World, LLC v Dep't of Civ. Rts.*, 987 N.W.2d 501, 507 (Mich. 2022).

To establish a prima facie case of hostile work environment under the ELCRA, Blewett is required to present evidence that: (1) she belonged to a protected class; (2) she was subjected to harassment, i.e., unwelcome conduct or communication; (3) the harassment was based on her protected class; (4) the harassment was intended to or did substantially interfere with her employment or created an intimidating, hostile, or offensive work environment; and (5) the defendant knew or should have known

about the harassment and failed to act. *Matthews v. Detroit Pub. Sch. Cmty. Dist.*, No. 19-13277, 2021 WL 4427176, at *12 (E.D. Mich. Sept. 27, 2021); *Beaver v. Macomb County*, No. 21-10750, 2025 WL 975468, at *25 (E.D. Mich. Mar. 31, 2025). "[A] plaintiff can demonstrate discriminatory harassment by either pointing to the use of race-specific and derogatory terms or by 'offer[ing] direct comparative evidence about how the alleged harasser treated members' of other races." *Strickland v. City of Detroit*, 995 F.3d 495, 500 (6th Cir. 2021) (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80–81 (1998)). But "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive . . . connotations, but actually constituted '*discrimination*'" because of race. *Oncale*, 523 U.S. at 81.

As Defendants correctly point out, Blewett has failed to demonstrate a prima facie case under these standards.

First, with respect to the third element, Blewett herself does not believe she was harassed because of her race. In fact, when asked if she believed Howard-Whisett's behavior towards her was motivated by her race, Blewett said no:

> Q: Do you believe that she [Howard-Whisett] made those statements and everything that you described to create your hostile work environment, you think that she did that because you're African American?
>
> A: Repeat that.
>
> Q: Do you think that she made those statements about I can fire you off the cash book and every other thing that you testified to that created a hostile work environment, do you think that she did those things because you're African American?
>
> A: No.

7

(ECF No. 15-2, PageID.186.) This alone could entitle the defense to summary judgment.

Second, with respect to the second and fourth elements of the prima facie case, while Blewett's complaint alleges that the workplace was a hostile environment for her and her African American colleagues (ECF No. 1, PageID.5–6), her summary judgment response brief contains only a bare-bones section on this issue. She simply indicates that her white co-worker, Dawn Green, received preferential treatment, or "special privileges," in job expectations and criticism. (ECF No. 18, PageID.301.) That preferential treatment is not described or explained beyond simply citing to Blewett's deposition. (*Id.*) But "it is not for the court to search the record and construct arguments. Parties must do that for themselves." *Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017) (declining to consider plaintiffs' arguments when they left "it to the court to seek out the relevant law, identify the relevant evidence, and develop their argument for them"); *see also Dice Corp. v. Bold Techs.*, 556 F. App'x. 378, 388, n.6 (6th Cir. 2014) (recognizing that "the district court was not required to comb through the uncited record to make sense of [plaintiff's] claim and, at the very least, [plaintiff] was obligated to explain the factual basis for its claim to the district court").

Doing its best to construe the record in the light most favorable to the non-movant, however, the Court will briefly address those portions of Blewett's deposition that give some indication of what this "special treatment" might have been.

Blewett testified that Howard-Whisett repeatedly berated Blewett about her work on the cashbook in front of her coworkers. (ECF No. 15-2, PageID.184.) She said

8

Howard-Whisett would publicly threaten to fire her "off the cashbook." (*Id.*) And once, Howard-Whisett excluded Blewett from a group outing, saying she needed to finish her cashbook instead of joining them. (*Id.* at PageID.152.) Blewett said this embarrassed her and made the workplace "hostile." (*Id.* at PageID.185–186.) Green purportedly did not receive similar treatment. (*Id.* at PageID.152–153.) But this does not rise to the level of a hostile work environment. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) ("Discrimination in this form occurs 'when the environment is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'") (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)). And, as mentioned, Blewett does not even think these comments were made because of her race. (*See id.* at PageID.186.)

Blewett also testified about other "special privileges" afforded to Green. Those included Green being able to miss work without calling in or taking leave, being 150 days late with an assignment without being fired, and using Blewett's bank token (an individualized login code) to process wire transfers while she was away. (*Id.* at PageID.142, 156–157.) But the only "evidence" of Green's "special treatment" comes from assumptions Blewett made. (*Id.* at PageID.154 ("I believe . . . [Dawn] had special privilege."); *id.* at PageID.158 ("I'm assuming that [Nikole] gave [Dawn] special privileges . . . .").)

For example, Blewett believed Green was absent without leave because she overheard Green mention being out of sick days and vacation days and because

9

Howard-Whisett would sometimes ask Blewett and her coworkers where Green was on days that she was not in the office. (*Id.* at PageID.158.) But Blewett admitted she did not know if Green had other forms of approved leave (like FMLA leave) or if her absences were truly unexcused. (*Id.* at PageID.159–160; *id.* at PageID.159 ("Q: [D]o you have any . . . proof or evidence to support your belief that [Dawn] had unexcused absences? . . . A: No, I don't.").) And there is nothing else in the record to support these assumptions.

Likewise, there is no evidence to support Blewett's assertion that Green was ever late with an assignment by 150 days. Blewett said she saw an email reminder about one of Green's overdue assignments—a credit card reconciliation from the Great Lakes Water Authority—and calculated that it was 150 days late. (*Id.* at PageID.170.) Blewett reached out to Deirdre Hendricks, the treasury manager at GLWA, to ask if the assignment had been completed. (*Id.* at PageID.169–170.) Hendricks apparently confirmed it was not complete, but did not tell Blewett why. (*Id.* at PageID.172.) When asked if it could have been someone other than Green that was responsible for the delay, Blewett said she did not know how the credit card reconciliation process worked. (*Id.*) And despite her assertion that several people were involved in this conversation by email and via a meeting (*id.* at PageID.171), Blewett does not provide any evidence or documentation of this conversation in her response.

As for the token, Blewett felt Green should not have used her token because Green had her own. (*Id.* at PageID.156–157). She later admitted, however, that

10

another coworker also used her token, and that Blewett herself sometimes used Howard-Whisett's token. (*Id.* at PageID.167–168.) Regardless of whether such token sharing was proper, it seemed to be the norm in the office, not a "special privilege" afforded to Green. Thus, it is not evidence of a racially motivated hostile work environment.

Lastly, there is nothing in the record before the Court to indicate that Blewett's African American coworkers also experienced hostility from Howard-Whisett. In her complaint Blewett alleges they did, and says they reported Howard-Whisett to HR. (ECF No. 1, PageID.5–6.) And Blewett also discusses texts and emails that Howard-Whisett sent to her berating her work, which she allegedly forwarded to her coworkers, who then discussed similar frustrations with Howard-Whisett. (*Id.* at PageID.6–7.) But no evidence of these incidents, complaints, or messages was produced.[1] And a plaintiff cannot avoid summary judgment by relying on allegations in the complaint. *See Palma v. Johns*, 27 F.4th 419, 455 (6th Cir. 2022) ("[A] party at summary judgment 'may not rest upon the mere allegations or denials of his pleading.'" (citation omitted)); *Warf v. U.S. Dept of Veterans Affs.*, 713 F.3d 874, 878

---

[1] Blewett contends this is the City's fault for not maintaining proper records. (ECF No. 18, PageID.293.) That may explain the absence of HR documentation. But Blewett does not explain why she could not, for example, provide declarations, affidavits, or deposition testimony from these other employees about their experiences with Howard-Whisett. Nor does it explain why she could not provide emails or text messages that she herself received and forwarded. And in her deposition testimony—one of the few pieces of evidence the Court did receive—Blewett said very little about these coworkers and their interactions with Howard-Whisett.

(6th Cir. 2013) ("To defeat a motion for summary judgment a plaintiff 'can no longer rely on the conclusory allegations of its complaint.'" (citation omitted)).

Though also not discussed in the briefs, the Court will also briefly address the one racially charged comment that Blewett did receive during her employment. In late 2018 or early 2019, Rob Rice, a white employee from outside of the Treasury Department, said something to Blewett to the effect of "where is your slave driver." (ECF No. 15-2, PageID.204–205, 211.) Although Rice is not a defendant in this case, the Court is to consider "harassment by all perpetrators combined" and "all incidents of alleged harassment" when determining "whether a plaintiff has alleged the existence of a hostile work environment." *Williams v. CSX Transp. Co.*, 533 F. App'x 637, 641 (6th Cir. 2013) (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562–63 (6th Cir. 1999)). But even combined with Howard-Whisett's behavior, Rice's racially charged comment does not give rise to a racially hostile environment. *Cf. Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[O]ffhand comments, and isolated incidents (unless extremely serious) will not amount to [a hostile environment.]"); *Jones v. FCA U.S. LLC*, 15 N.W.3d 617, 618 (Mich. 2025) (Cavanagh, J., concurring) (explaining that a single use of "an unambiguously racial epithet such as the n-word" may be sufficiently severe enough to create a hostile work environment under the ELCRA); *Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 684 (6th Cir. 2024).

What is more, there is no basis to hold the City or Howard-Whisett liable based on Rice's comment. Recall that the fifth element of a hostile work environment prima facie case requires a plaintiff to demonstrate "the defendant knew or should have

12

known about the harassment and failed to act." *Matthews*, 2021 WL 4427176, at *12. Here, the Defendants did not fail to act. The City investigated the comment and disciplined Rice with two weeks' suspension. *See Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 916 (Mich. 2000) ("An employer may avoid liability in a hostile environment case if it adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment." (cleaned up)). And aside from Blewett's speculations, there is nothing tying the comment to Howard-Whisett. (*See* ECF No. 15-2, PageID.213.) Even assuming Howard-Whisett took an adverse action against Blewett after she reported this incident to HR, as Blewett contends (*id.* at PageID.186–187), that would be relevant to a claim for retaliation, not for a racially hostile environment.

In short, even taking the facts in the light most favorable to Blewett, there is insufficient evidence to create a genuine issue as to whether Howard-Whisett treated Blewett differently because of her race—or that she created a hostile environment by doing so. Blewett makes broad assertions, unsupported by any evidence, that she and her African American coworkers were harassed because of their race. But "[t]he court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). Likewise, Blewett speculates about special privileges that Green received for being white. But "[s]peculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg*

13

*v. Ind. Bell Tel. Co.*, 47 F. 3d 928, 932 (7th Cir. 1995). Based on Blewett's own admission, she was not subject to a hostile environment because of her race. (ECF No. 15-2, PageID.186.) And based on the evidence presented, no reasonable jury could find such. Thus, her claim of a racially hostile environment in violation of ELCRA does not survive summary judgment.

### B.

Next are Blewett's claims that her termination was discriminatory. Her § 1983 and ELCRA race discrimination claims are both governed by the familiar Title VII standard, the *McDonnell Douglas* burden shifting framework. *Golden v. Town of Collierville*, 167 F. App'x 474, 479 (6th Cir. 2006); *Stewart v. County of Saginaw*, 736 F. Supp. 3d 527, 556 (E.D. Mich. 2024); *see also Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990) ("To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class."). So the Court will address these claims together.

For both claims, a plaintiff must either present direct evidence of discrimination (which Blewett does not present) or make out a prima facie case by demonstrating: (1) that she is a member of a protected class, (2) that she was subject to an adverse employment decision, (3) that she was qualified for the position, and (4) that similarly situated non-protected employees were treated more favorably. *Kelly v. Graphic Packaging Int'l, LLC*, Nos. 24-1400/1599, 2025 U.S. App. LEXIS 4127, at

*8 (6th Cir. Feb. 21, 2025); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

At the outset, Defendants contend there is no evidence of discriminatory intent because Blewett testified that her termination was due to retaliation and not her race:

> Q: And why were you terminated?
>
> A: Due do my performance review.
>
> Q: Due to your performance review?
>
> A: Yes.
>
> Q: What do you believe? Why do you dispute that?
>
> A: I dispute it based on my performance review. How can you give me a raise within that same year and terminate me due to my performance review. It doesn't add up.
>
> Q: So you think there was another reason you were terminated?
>
> A: I believe so.
>
> Q: And what's that reason?
>
> A: I just—you know, I think it was more of a retaliation or maybe . . . because it was a hostile environment. . . . It was very hostile. . . .
>
> Q: Why do you believe that you were terminated?
>
> A: I believe that I was terminated because of hostile environment . . . .

(ECF No. 15, PageID.112 (citing ECF No. 15-2, PageID.145–146).) Defendants argue "[t]his admission is fatal to [her] claim[s]." (*Id.*) But this admission is not as clear as Blewett's denial that Howard-Whisett's hostile behavior was racially motivated (*see* ECF No. 15-2, PageID.186); Blewett's assertions that she was terminated for

15

retaliation and because of a hostile environment do not rule out the possibility that she was referencing race. But the Court need not dwell on this issue, because the motion can be decided on an analysis of the prima facie case.

Defendants' primary argument, and the one that Blewett also focuses on, is that Blewett cannot establish a prima facie case of discrimination because she has failed to identify a similarly situated non-protected employee who was treated more favorably. (ECF No. 15, PageID.113.) "To be considered similarly situated, a comparator need not be identical, but should be similarly situated 'in all relevant respects.'" *Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 511–12 (6th Cir. 2022) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). "Superficial similarities between a disciplined employee and his colleagues" are not enough to make them comparators. *Arendale v. City of Memphis*, 519 F.3d 587, 604 (6th Cir. 2008). Blewett again points to Green, the sole white employee in the Treasury Division, as her comparator. Recall that Blewett contends that Green was 150 days late with a credit card reconciliation and was not disciplined while Blewett was fired for (as she interprets it) being 101 days late with one cashbook. (ECF No. 15-2, PageID.152, 156, 170, 190.) This, Blewett says, makes them similarly situated employees that were treated differently. Not so.

"Particularly relevant to this case is whether the proffered comparator and the plaintiff 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Blount*, 55 F.4th at 512 (citing *Ercegovich*, 154 F.3d at 352). "In order to

16

be considered similarly situated, employees must have 'engaged in acts of comparable seriousness.'" *Id*. (quotation marks omitted). Contrary to what Blewett claims, Green did not engage in misconduct of comparable seriousness to Blewett, and no jury could find otherwise.

First, as discussed above, it is not clear that Green ever was late with an assignment. Blewett said she saw an email reminder about one of Green's overdue credit card reconciliations and calculated that it was 150 days late. (ECF No. 15-2, PageID.170.) But Blewett later admitted she did not know how the credit card reconciliation process worked or why the reconciliation was not completed—that is, whether or not it was Green's misconduct that caused the delay. (*Id*. at PageID.172.)

And even assuming that Green was 150 days late with a credit card reconciliation, that is not substantially similar conduct to what Blewett engaged in. Indeed, Defendants do not argue that Blewett was 101 days late with one cashbook. They assert—and the record evidence supports—that Blewett was late with 101 *different* cashbooks, i.e., almost half of the cashbooks she turned in. (ECF No. 15-3, PageID.238.) Blewett argues that her deposition testimony that she "was not aware that she was late 101 times" creates a genuine dispute of fact on this point. (ECF No. 18, PageID.293.) But not being aware of something is not the same as disputing that it happened. *Cf. Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 839 (6th Cir. 2021) ("[C]onvenient memory lapses do not create factual disputes that are genuine."). Additionally, Blewett concedes that the cashbook was her "main assignment." (ECF No. 15-2, PageID.138.) There is no indication in the record that

17

credit card reconciliations were equally important. So even if Green was 150 days late with one credit card reconciliation, this is not misconduct of comparable seriousness.

What is more, Blewett's 101 late cashbooks were not the only reason she was fired. Blewett's termination notice detailed other problems—like her cashbook not being reconciled each month and her journals having errors that needed to be corrected multiple times. (ECF No. 15-3, PageID.238.) The record does not show that Green ever had similar such issues. So whether Blewett was 101 days late once or was late 101 different times, the outcome is the same: Green is not an adequate comparator.

Perhaps anticipating this conclusion, Blewett switches gears, arguing she does not need a comparator to prove her prima facie case. (ECF No. 18, PageID.296.) She argues "the relevant inquiry is whether the conduct at issue 'give[s] rise to an inference of unlawful discrimination.'" (*Id.* (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 US 248, 253 (1981).) And she says that the Defendants' lack of "explanation as to why someone without another discipline that has been produced in this lawsuit suddenly goes from a satisfactory employee to termination" raises a fact issue as to whether discrimination occurred. (*Id.* at PageID.299.) This also fails to persuade.

True, "the standard for establishing a prima facie case 'is not inflexible,'" and "there may be cases where there is so much evidence of a decision-maker's discriminatory animus that a plaintiff's failure to satisfy the fourth element of the *McDonnell Douglas prima facie* case is not fatal to her claim." *Birch v. Cuyahoga*

18

*Cnty. Probate Court*, 392 F.3d 151, 166 (6th Cir. 2004) (quoting *Burdine*, 450 U.S. at 253 n.6). But this is not one of those cases. The record certainly does not contain an "overwhelming" amount of evidence that Blewett was fired because of her race.

And, in any event, Blewett misstates the record—she was not, as she states, a "satisfactory employee" who was "suddenly" fired. Since 2018, Blewett's performance reviews showed that she struggled with turning assignments in on time. Blewett's "dependability and reliability" rating showed a steady decline: from "achieved expectations" in 2018 (ECF No. 19-1, PageID.347), to "minimally satisfactory" in 2019 (ECF No. 18-2, PageID.330), and finally to "unacceptable" in 2020 (*Id.* at PageID.324). She did not "suddenly go[] from a satisfactory employee to termination." (ECF No. 18, PageID.299.) She struggled with meeting deadlines for two years before being let go. And she herself admitted that there were errors with her work. (ECF No. 15-2, PageID.173–179; ECF No. 19-1, PageID.349.)

Accordingly, because Blewett fails to establish a prima facie case that she was discriminated against because of her race, her § 1983 and ELCRA claims for racial discrimination must be dismissed.[2]

---

[2] The Court will not address Defendants' arguments about a legitimate non-discriminatory reason and pretext which were only raised in the reply brief. *See Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671, 682–83 (E.D. Mich. 2002) ("[I]t is not the office of a reply brief to raise issues for the first time." (citing *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993))). The Court also will not address Defendants' arguments about qualified immunity, though properly raised, because they do not impact the outcome.

## IV.

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 15) is GRANTED. A separate judgment will follow.

IT IS SO ORDERED.

Dated: May 27, 2025

s/Laurie J. Michelson  
LAURIE J. MICHELSON  
UNITED STATES DISTRICT JUDGE